# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|                          |                              |
|--------------------------|------------------------------|
| **VIKKI MITCHELL**,      |                              |
| Plaintiff,               |                              |
| v.                       | Case No. 15-cv-1305 (CRC)    |
| **DISTRICT OF COLUMBIA**,|                              |
| Defendant.               |                              |

## MEMORANDUM OPINION

Plaintiff Vikki Mitchell was terminated after serving 12 years as a detention officer with the District of Columbia Department of Youth Rehabilitation Services ("DYRS"). In this case, Mitchell brings two distinct sets of employment discrimination claims against the District of Columbia arising from her tenure with DYRS. One relates to sexual harassment she allegedly experienced at the hands of a supervisor at the agency's Oak Hill youth detention facility in 2007, while the other challenges her termination by DYRS in 2014. The Court previously dismissed one of Mitchell's state-law claims due to failure to exhaust administrative remedies, and she has conceded that the other was untimely. The District now moves for summary judgment on all of her remaining federal claims, which are brought under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Family and Medical Leave Act of 1993 ("FMLA"). As explained further below, the Court will deny the District's motion with respect to the claims arising from Mitchell's alleged sexual harassment and the FMLA claim arising from her termination, but will grant summary judgment for the District on Mitchell's Title VII termination-based claim.

**I. Background**

A. Factual Background

The D.C. Department of Youth Rehabilitation Services operates a network of secure juvenile detention and treatment facilities in the Washington, D.C. area. Vikki Mitchell began working for DYRS in 2002 as a Youth Development Representative (a euphemistic detention officer) at the Oak Hill Youth Center, which was closed in 2009. She later worked at DYRS's Youth Services Center.

As noted above, this drama proceeds in two acts. The first centers on Ms. Mitchell's treatment by a former Oak Hill shift commander named Jerome Parkinson in 2007 and the ensuing retaliation she claims she suffered as a result of reporting his misbehavior. The second involves her termination from DYRS in 2014, which the agency attributed to a string of violations of the agency's time and attendance policies, but which Mitchell maintains was engineered to retaliate against her for taking too much time off work, including approved family medical leave to care for a relative. The facts relevant to each episode follow.

1. *Harassment and Retaliation: 2007–2008*

On August 9, 2007, Mitchell lodged a written complaint with DYRS's Deputy Director, David Brown. Pl.'s Opp'n Mot. Summ. J. Ex. C. In it, Mitchell stated that since July 12, 2007 her shift commander Jerome Parkinson had been repeatedly touching her, including her breasts, badgering her to accompany him on vacation, and summoning her to his office alone on a daily basis. Id. Mitchell further indicated that on July 29, 2007 she reported Parkinson's inappropriate touching to Oak Hill's Deputy Superintendent David Thomas, who failed to intercede. Id. Upon receipt of Mitchell's written complaint, Deputy Director Brown granted her request for a transfer

2

to DYRS's Youth Services Center and commenced an internal investigation of Parkinson's conduct. Id. Exs. A, D.

On August 15, 2007, about a week after Mitchell was transferred from Oak Hill, a "barring notice" addressed to all staff from Oak Hill's Superintendent, Dextar Dunbar, was posted at the main entrance to the facility. Pl.'s Opp'n Mot. Summ. J. Ex. E. The notice stated in bold print: "please do not allow Ms. VICKI MITCHELL" on the premises. Id. Ex. E. When Mitchell arrived at Oak Hill for a previously scheduled training session that day, staff members questioned her about the notice and she was not able to attend the training. Id. Ex. G, Ex. F (memorandum scheduling training). Although Dunbar issued a retraction five days later asking staff to disregard the notice and apologizing to Mitchell for issuing it, nothing in the record indicates why the notice was issued in the first place. Def.'s Mot. Summ. J. Ex. 3. Based on these events, the District of Columbia Office of Human Rights determined that there was probable cause to believe that Mitchell had been subjected to unlawful discrimination on the basis of sex pursuant to the D.C. Human Rights Act. Pl.'s Opp'n Mot. Sum. J. Ex. H.

Parkinson resigned from his position in December 2007. Pl.'s Opp'n Mot. Summ. J. Ex. H. The next day, Mitchell was transferred back to Oak Hill and placed under the supervision of Deputy Superintendent Thomas, the person to whom she had originally complained about Parkinson. Id. Ex. J. On September 22, 2008, Mitchell filed another complaint with DYRS Deputy Director Brown, alleging that Thomas was harassing and retaliating against her for the original complaint against Parkinson. Id. She specifically complained that Thomas denied her a uniform, chided her about how her car was parked, changed her post assignments, ignored her complaints, showed preferential treatment to other employees, and threatened her job because of

time she took off for approved medical appointments. Id. The District disputes that these actions took place and, if they did, that they were retaliatory. Def.'s Mot. Summ. J. at 15–17.

   2.   *Termination: 2014–2015*

By 2012, Oak Hill had been shuttered and Mitchell was working at DYRS's Youth Services Center. In December of that year, Mitchell requested and was approved for up to 640 hours of unpaid, intermittent FMLA leave to care for a family member, to be taken over a 24-month period. Pl.'s Opp'n Mot. Summ. J. Ex. V. She took this leave on 28 separate days throughout 2013. Def.'s Mot. Summ. J. Ex. 22 (documenting FMLA leave from January to September 2013). At some point on or prior to November 13, 2013, Matthew Stern, Mitchell's supervisor at the time, prepared a "Human Resources Personnel Request Form" recommending to his supervisors that Mitchell be terminated for being absent without leave ("AWOL") and late to work several times. Def.'s Mot. Summ. J. Ex. 16.[1]

On January 8, 2014, Stern sent Mitchell a letter providing 45-day advance notice of DYRS's proposal to remove her from her position. Def.'s Mot. Summ. J. Ex. 4. The Notice specifically listed five "facts in support of the determination": (1) in September 2013, Mitchell was late to work three times by two, three, and one minute, respectively; (2) on October 3, 2013 Mitchell called in sick less than one hour before her shift and was charged with AWOL; (3) on October 23, 2013 Mitchell left her post to attend a doctor's appointment (the parties dispute whether this was pre-approved); (4) on October 24, 2013 Mitchell again called in sick under an hour before her shift and was charged with AWOL; and (5) on November 4, 2013 Mitchell was more than 15 minutes late to work. Id. Mitchell was provided a copy of the proposed removal

---

[1] Although Stern did not sign or date the form, the narrative portion indicates that he prepared it. An unidentified division head signed and dated the form November 13, 2013.

notice mid-January 2014. Mitchell Dep. 112:7-13. Per District policy, the day she received the notice, Mitchell turned in her ID and did not return to work. She continued to be paid, however. Id. at 122:6-20.

Mitchell challenged her proposed termination before a hearing officer, who issued a final determination sustaining the proposal on February 27, 2014. Def.'s Mot. Summ. J. Ex. 15. Mitchell received the final determination on March 18, 2014 and the hearing officer set her official termination date for April 4, 2014. Id. Ex. 17.

### B. Procedural Background

After pursuing both sets of claims through the EEOC administrative process, Mitchell filed suit in this Court on August 12, 2015 and amended her complaint on November 4, 2015. The amended complaint included claims under Title VII, the Family and Medical Leave Act ("FMLA"), the District of Columbia Human Rights Act ("DCHRA"), and the District of Columbia Family and Medical Leave Act ("DCFMLA"). See generally Complaint. The Court dismissed Mitchell's DCHRA claims as untimely, see March 9, 2017 Minute Order, and Mitchell has conceded that her DCFMLA claims are also untimely, Pl.'s Opp'n Mot. Summ. J. at 1. However, the Court declined to dismiss Mitchell's Title VII claims on timeliness grounds. With respect to her Title VII claims stemming from the events that took place in 2007 and 2008, the Court found her hostile work environment claim was subject to a more lenient exhaustion standard and thus was timely filed with the EEOC. March 9, 2017 Minute Order; March 7, 2017 Hearing Tr. And as for her Title VII claim stemming from her 2014 termination, the Court found that the existence of a work sharing agreement between the EEOC and DCOHR extended the time for Mitchell to contact the EEOC from 180 to 300 days, and that Mitchell filed her

claim within that period. April 25, 2017 Order. The District now moves for summary judgment on those Title VII claims, along with Mitchell's FMLA claim.

## II. Standard of Review

Granting a motion for summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to demonstrate an "absence of a genuine issue of material fact" in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court must accept as true the non-movant's evidence and draw all reasonable inferences in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-movant may not, however, rely on "mere allegations" or conclusory statements. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

## III. Analysis

### A. Claims Based on Alleged 2007 Sexual Harassment

#### 1. *Hostile Work Environment in Violation of Title VII*

In Count III of her amendment complaint, Mitchell alleges that the sexual harassment that Mr. Parkinson subjected her to at Oak Hill created a hostile work environment under Title VII for which the District is vicariously liable. Employers are vicariously liable under Title VII for "the acts of a supervisory employee whose sexual harassment of subordinates has created a hostile work environment amounting to employment discrimination." Faragher v. City of Boca Raton, 524 U.S. 775, 780 (1998) ("Faragher"). The District does not contest that Parkinson's behavior, if established, would create a hostile work environment under Title VII. February 27, 2018 Hearing Tr., 4:6-15. Instead, the District argues that it should be relieved of liability under the affirmative defense recognized by the Supreme Court in Faragher, which accounts for both

the "reasonableness of the employer's conduct as well as that of a plaintiff victim." 524 U.S. at 780. Specifically, the Faragher defense requires that (1) the "employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807. To successfully assert the defense, a defendant must ultimately prove both elements by a preponderance of the evidence. Id. At the summary judgment stage, the employer must establish both elements as a matter of undisputed fact.

The Court need not assess whether the District acted promptly enough in response to Mitchell's complaints to satisfy Faragher's first prong because the defense clearly fails the summary judgment standard at prong two. Abundant evidence in the record suggests that Mitchell reasonably attempted to avoid harm by availing herself of the District's anti-sexual harassment policies. The parties do not dispute the essential chronology set forth in Mitchell's August 9, 2007 written statement to DYRS's Deputy Director, David Brown.[2] Pl.'s Opp'n Mot. Summ. J. Ex. C. Mitchell stated that Parkinson's harassment began on July 12, 2007 and that she reported it 17 days later, on July 29, 2017, to Oak Hill's Deputy Superintendent, David Thomas. Id. Mitchell further asserted that Thomas failed to take any corrective action and that the harassment continued, id., thus requiring her to elevate her complaints to Deputy Director Brown. This series of events alone could convince a reasonable juror that Mitchell properly sought protection under the District's policies. See, e.g., Jones v. District of Columbia, 646 F. Supp. 2d 42, 49 (D.D.C. 2009) (finding a genuine issue of material fact as to the second prong of

---

[2] While the statement itself does not indicate to whom it was sent, the District does not contest that it was directed to Deputy Director Brown.

7

the Faragher defense because plaintiff "took advantage of the preventive and corrective opportunities" by reporting incidents of sexual harassment in compliance with the harassment policy and "submitting a written complaint she ought not to have needed had her supervisors fulfilled their roles in the sexual harassment procedures.").

The District's arguments to the contrary are unavailing. It first claims that Mitchell "advances no evidence that she ever reported the harassment to her department's EEO counselor, as required by [District] policy." Reply at 8. Yet the District's government-wide policy on sexual harassment allows employees to report harassment to "the Equal Employment Office (EEO), an EEO counselor, an EEO representative, *or* an office manager or supervisor." Def.'s Mot. Summ. J. Ex. 25 at 2 (emphasis added). And Mitchell did just that: she first reported Parkinson's conduct verbally to a superior, Deputy Superintendent Thomas, and then in writing to DYRS Deputy Director Brown after Thomas apparently failed to take corrective action. Recognizing as much, the District goes on to suggest that Mitchell unreasonably delayed reporting Parkinson's conduct to a supervisor, claiming that she "only complied with the policy when she reported the harassment [to Brown] 'on or about August 9, 2017.'" Reply at 8. As noted, however, her written statement indicates that she complained verbally to Deputy Superintendent Thomas on July 29, 2017, about two weeks after the harassment reportedly began. That timing is close enough to support a conclusion that Mitchell promptly reported the alleged harassment to a supervisor as envisioned by the policy. Cf. Taylor v. Solis, 571 F.3d 1313, 1319 (D.C. Cir. 2009) (finding that the plaintiff unreasonably failed to take advantage of corrective opportunities by only telling a non-supervising coworker about the harassment several months after it had occurred).

Because at least one prong of the Faragher defense presents material issues of disputed fact, the District is not entitled to the defense on summary judgment. The Court will therefore deny summary judgment to the District on Mitchell's hostile work environment claim.[3]

2. *Retaliation in Violation of Title VII*

Mitchell also alleges that DYRS retaliated against her for reporting Parkinson's sexual harassment. In order to demonstrate unlawful retaliation under Title VII, an employee must show that "she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her." Weber v. Battista, 494 F.3d 179, 184 (D.C. Cir. 2007); 42 U.S.C.A. § 2000e-3. To establish a prima facie case of retaliation, a plaintiff must show (1) that she engaged in "activity protected by" Title VII; (2) that the employer engaged in conduct that was materially adverse to the plaintiff; and (3) "that the adverse action was causally related to the plaintiff's exercise of protected rights." Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1423 (D.C. Cir. 1988), on reh'g, 852 F.2d 619 (D.C. Cir. 1988) (laying out three-prong test); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006) (clarifying that, for the second prong, the employer's action must be "materially" adverse to the employee).

The District acknowledges that Mitchell engaged in protected activity when she complained to two supervisors about Parkinson's conduct, both verbally and in writing. It contends, however, that Mitchell did not suffer any materially adverse action in retaliation for

---

[3] Mitchell did not move for summary judgment on the District's asserted Faragher defense. As a result, the Court need not decide whether any reasonable juror could conclude that the evidence supports the second prong of the defense. The Court will consider whether there is sufficient evidence to allow the District to present the defense to a jury on a motion *in limine* if requested.

her complaint. Mitchell alleges two sets of retaliatory actions on the part of DYRS: (1) the "barring notice" issued by the Oak Hill Superintendent that prevented her from entering the premises about five days after her transfer from the facility; and (2) various acts of retribution taken by her supervisor David Thomas after Mitchell returned to Oak Hill in December 2007. The District counters that none of these alleged events constitute materially adverse actions and that, in any case, none of the actions were taken in retaliation for Mitchell's complaints about Parkinson.

As for the barring notice, the District argues that it was a "trivial slight" that did not rise to the level of an adverse action. Def.'s Mot. Summ. J. at 17. The Court disagrees. A materially adverse employment action in the retaliation context is one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 57. While this does not include "petty slights, minor annoyances, and simple lack of good manners," id. at 68, it does encompass more than just "cognizable employment actions such as discharge, transfer or demotion." Passer v. Am. Chem. Soc., 935 F.2d 322, 331 (D.C. Cir. 1991). The notice, which was posted on a public entrance and addressed to all staff members, prohibited Mitchell from entering the premises and prevented her from attending a scheduled training class. Because a reasonable jury could find that a public barring notice of this kind would be sufficiently humiliating to dissuade an employee from complaining about discrimination, the Court finds that there is a genuine dispute of fact over whether the barring notice was a materially adverse action.

The District also disputes the causal nexus between Mitchell's protected activity and the adverse action, insisting that the barring notice was a "mistake" which Superintendent Dunbar retracted and apologized for five days later. Def.'s Mot. Summ. J. at 17. But the temporal

proximity between Mitchell's complaint and the barring notice (also five days), combined with the lack of evidence in the record as to why the notice was issued in the first place, creates a genuine dispute of material fact as to whether the barring notice was posted in retaliation for Mitchell's protected activity.  See, e.g., Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C. Cir. 2003) (holding that "a close temporal relationship may alone establish" the causal connection required to make a prima facie case of retaliation).

Mitchell also claims that after she returned to Oak Hill, Thomas "continued to harass and retaliate against" her for her complaint about Parkinson.  Pl.'s Opp'n Mot. Summ. J. Ex. J.  In a letter to DYRS Deputy Director Brown on September 22, 2008, Mitchell claimed that Thomas was mistreating her in a number of ways, including changing her post assignments, showing preferential treatment to other employees, and threatening her job.  Id.  These allegations, especially when considered collectively and with the barring notice, are enough for a reasonable jury to conclude that Mitchell was retaliated against for her complaint about Parkinson.  The Court will therefore deny summary judgment to the District on Mitchell's Title VII retaliation claim.

### B.  Claims Based on Mitchell's 2014 Termination

Although the record does not specify when, Mitchell was transferred back to the Youth Services Center after the Oak Hill facility closed in 2009.  As noted previously, Mitchell's second set of claims stem from her eventual termination by DYRS in 2014.  She brings both an FMLA and a Title VII gender discrimination claim based on the termination.

#### 1.  *Retaliation for taking FMLA leave*

The FMLA requires employers to give covered workers leave for family-related medical reasons.  And it prohibits employers from interfering with an employee's exercise of their rights

under the statute, including by retaliating against the employee for taking authorized leave. 29 U.S.C. § 2615(a). Mitchell challenges her supervisor's proffered reasons for her termination and alleges "his true reason for proposing her termination is that she was taking too much time from work." Pl.'s Opp'n Summ. J. at 14.

The elements of a prima facie case of FMLA retaliation mirror the elements for Title VII retaliation. But once a defendant offers a legitimate, nondiscriminatory reason for its action, the court need not decide whether the plaintiff has made a prima facie case and must instead proceed "to the ultimate question of retaliation *vel non*." Jones v. Bernanke, 557 F.3d 670, 681 (D.C. Cir. 2009). At that point, "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. (internal citation omitted).

To recap the salient facts: On October 23, 2013, Mitchell left the Youth Services Center for about two hours to seek medical attention for an injury (she had been hit in the face with a basketball). Pl.'s Opp'n Mot. Summ. J. Ex. Q. Upon her return, her supervisor, Matthew Stern, questioned her about her whereabouts. Mitchell responded that Stern had given her permission to see a doctor, which Stern denied. Stern subsequently prepared an incident report indicating that Mitchell had violated DYRS policies against "abandonment of post" and "misfeasance." Def.'s Mot. Summ. J. Ex. 8. Sometime on or before November 13, 2013, Stern also prepared a "Personnel Request Form" recommending to his superiors that Mitchell be relieved of her duties, based principally on the October 23 incident. Id. Ex. 16. Then, on January 8, 2014, Stern sent Mitchell an official notice of proposed removal. Id. Ex. 4. As noted previously, the proposed removal notice offered a series of facially legitimate and nondiscriminatory reasons for

12

recommending Mitchell's termination: (1) she had been late to work three times in September 2013; (2) she had been placed on AWOL status twice in October 2013 for calling in sick less than an hour before her shift was scheduled to begin, contrary to agency policy; (3) she had been placed on AWOL status again on October 23, 2013, for abandoning her post for approximately two hours; and (4) she arrived at work more than 15 minutes late on November 4, 2013. Id. The notice also indicated that the appropriate sanction was termination (as opposed to lesser penalties) given Mitchell's prior disciplinary record, which included two suspensions and a 90-day leave restriction. Id.

Mitchell disputes that the reasons listed in the removal notice are the true reasons for her dismissal. She counters that Stern "concocted violations where none existed" because she was "taking too much time off work." Pl.'s Opp'n Mot. Summ. J. at 14–15. The question for the Court, then, is whether Mitchell has "produced sufficient evidence for a reasonable juror to find that [DYRS's] asserted non-discriminatory reason was not the actual reason and that [DYRS] intentionally discriminated against" her. Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Although it is somewhat of a close question, the Court finds that she has.

First, Mitchell raises legitimate questions as to whether the three instances of tardiness in September—where she was under three minutes late each time—are even sanctionable under the applicable DYRS time and attendance policy. Pl.'s Opp'n Mot. Summ. J. Ex. L (DYRS disciplinary policy listing sanctions for tardiness violations only when employees are over five minutes late). And even if they are technically sanctionable under the policy, the "gotcha" quality of the minor violations could suggest that the policy was being applied especially strictly against Mitchell. Regardless, Stern did not prepare an incident report for the three September tardiness incidents until over a month later, on November 4, which could suggest that the

13

infractions were not serious enough to report at or near the time they occurred. Pl.'s Opp'n Mot. Summ. J. Ex. K.

Second, Mitchell has raised a material factual dispute regarding the validity of Stern's October 23, 2013 AWOL finding. The record shows that she disputed the finding at the time, insisting that Stern gave her permission to see a doctor to receive treatment for her injury. Def.'s Mot. Summ. J. Ex. 8. She has also produced a sworn statement by a co-worker who witnessed her conversation with Stern about seeking medical care and accompanied her to the doctor. Pl.'s Opp'n Mot. Summ. J. Ex. Q. Ordinarily, the Court would not examine the facts behind a facially legitimate reason offered by an employer to reach a personnel decision. As the District notes, the question usually is not whether the underlying basis for the action is correct, but rather whether the employer "honestly believes in the reasons it offers." See Brady, 520 F.3d at 495 (internal citation omitted). In situations like this, however, where the decision-maker is directly involved in the incident giving rise to the employment action, some testing of the facts is appropriate. After all, if a juror were to believe Mitchell's account of the October 23 incident and disbelieve Stern's, she would be right to question whether Stern "reasonably believed" that the incident warranted Mitchell's termination.[4]

Third, in addition to the September tardiness incidents, Mitchell offers evidence that Stern documented several of the other infractions in the notice of proposed termination after the fact, around the time he initiated the termination process in November 2013. See Def.'s Mot.

---

[4] Mitchell also contests her October 24, 2013 AWOL classification for calling in sick less than an hour before her shift began. She disputed that classification at the time, stating that she had called in an hour and two minutes before her shift, a claim she later repeated in her deposition. Def.'s Mot. Summ. J. Ex. 16; Mitchell Dep. 139:22. As with the October 23 incident, Stern was involved in the underlying AWOL determination. See Def.'s Mot. Summ. J. Ex. 21.

Summ. J. Ex. 20 (incident form for the October 24 AWOL signed by Stern on November 5); Pl.'s Opp'n Mot. Summ. J. Ex. Q (incident form for the October 23 AWOL signed by Stern on November 2). This runs contrary to DYRS's incident reporting policy, which states that all incidents, including staff discipline, shall be reported "immediately" during normal business hours. Def.'s Mot. Summ. J. Ex. 23. These delays could suggest that Stern used reasons that he did not consider serious enough to memorialize promptly per District policy as pretext for Mitchell's termination.

Taken together, the Court finds that the above-described evidence is sufficient to support a fair inference that the reasons cited in the removal notice are not the true reasons for Mitchell's termination. But that alone does not defeat summary judgment because Mitchell must also introduce evidence from which a reasonable jury could infer that the true reason was *retaliatory*. On this score, Mitchell alleges she was fired because she was "taking too much time off work," some of which was authorized family medical leave. And the record confirms that Mitchell had repeatedly taken authorized leave prior to her termination, including family medical leave. DYRS time records indicate that she took 28 days of family medical leave prior to November 2013, including 10 days in September. Def.'s Mot. Summ. J. Ex. 22. This uptick in FMLA leave shortly before Stern took steps to terminate Mitchell could be indicative of retaliatory intent. See Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015) ("The temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation.").

The District correctly notes that employers can require that employees taking FMLA leave comply with reasonable leave policies and insists that Mitchell was terminated for violating a number of those policies. See, e.g., Allen v. Butler County Com'rs, 331 F. App'x

389 (6th Cir. 2009) (holding that a county's "internal call-in policy neither conflicts with nor diminishes the protections guaranteed by the FMLA."). But the timing between her authorized absences and her termination—coupled with evidence undermining the credence of DYRS's reasons for the termination—supports a reasonable inference that Mitchell was fired for taking too much family medical leave.

In sum, a reasonable jury could well determine that Mitchell's tardiness and long history of time and attendance infractions were the genuine reason for her termination. This history included suspensions and leave restrictions imposed before she even requested and started taking FMLA leave. But it could also determine that these reasons were a guise for unlawful retaliation for the reasons described above.[5] The Court will therefore deny summary judgment to the District on this claim.

2. *Discrimination on the basis of gender in violation of Title VII*

In Count II of her complaint, Mitchell alleges that DYRS discriminated against her on the basis of gender in violation of Title VII. As a threshold matter, the District argues that Mitchell's Title VII termination claim is time barred because she did not raise her claim with the EEOC soon enough. Not so. The Court has already ruled that Mitchell had 300 days to contact

---

[5] Although the parties do not raise the issue in their briefs, a question remains as to whether Mitchell, in order to establish that she was fired in retaliation for exercising her FMLA rights, will have to establish at trial that Stern knew that she was authorized to take and/or took FMLA leave specifically, or whether his knowledge of any type of authorized leave will suffice. For purposes of summary judgment, the Court finds that a reasonable jury could infer that as Mitchell's immediate supervisor, Stern was aware that she had taken family medical leave, especially given his direct involvement in enforcing her compliance with DYRS's leave policies. See Jones, 557 F.3d at 679 (finding that "circumstantial evidence" that a supervisor knew about protected activity before taking an adverse employment action will suffice to survive summary judgment).

the EEOC after she was terminated. See April 25, 2017 Order. But the District raises a new timeliness argument here: that the clock for EEOC filing started running mid-January, 2014, when Mitchell received the January 8 notice of proposed removal, rather than on March 18, when she learned she had actually been terminated, or on April 4, her official termination date. Def.'s Mot. Sum. J. at 12. If the clock started running in mid-January, Mitchell would have had only until sometime in early November (300 days later) to file her complaint. And because Mitchell first submitted an intake form to the EEOC regarding her termination on December 17, 2014, her claim would be untimely. Supp. to Opp'n to Mot. for Judgment on Pleadings Ex. 3.

But the clock did not start running in mid-January. This is because a notice of *proposed* removal is not the employment action Mitchell is challenging. Rather, she is challenging her *actual* termination, when she stopped receiving pay. The District argues that Chadron v. Fernandez, 454 U.S. 6 (1981), compels the Court to start the statute of limitations clock in January. But that case held that the limitations period begins to run when notice of *final* termination is given, not when notice of *proposed* termination is given.[6] Id. at 8. Thus, the clock started running on March 18, 2014, when Mitchell received notice of her official termination, putting her December 17, 2014 EEOC intake form squarely within the 300-day period.

Turning to the merits, Mitchell alleges that her termination was unlawful gender discrimination under Title VII. Title VII makes it an "unlawful employment practice" for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex,

---

[6] In fact, courts have found that suspension *with* pay (which was essentially Mitchell's status while she awaited a final determination), is not an adverse employment action at all. See, e.g., Brown v. Georgetown Univ. Hosp. Medstar Health, 828 F. Supp. 2d 1, 9 (D.D.C. 2011).

or national origin." 42 U.S.C. § 2000e–2(a)(1). Again, the Court must resolve "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex?" Brady, 520 F.3d at 494.

The District proffers legitimate, non-discriminatory reasons for Mitchell's termination—two AWOLS, four instances of tardiness, and one instance of abandoning her post. As explained in the previous section, Mitchell does offer evidence to support her argument that these reasons were pretextual; however, in order to survive summary judgment on her Title VII claim, the "evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action" was gender discrimination. Walker, 798 F.3d at 1093; see also Burton v. District of Columbia, 153 F. Supp. 3d 13, 58 (D.C. Cir. 2015) ("To survive summary judgment based solely on evidence of pretext . . . a plaintiff must demonstrate that a 'reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason.'"). Mitchell fails to do so.

To support an inference that the employer's proffered reason is pretext for discrimination, a plaintiff may point to the "employer's better treatment of similarly situated employees outside the plaintiff's protected group." Burton, 153 F. Supp. 3d at 58. Here the only evidence Mitchell offers is that a male colleague was charged with 47 hours of AWOL in a six-month period yet was not terminated. See Pl.'s Opp'n Mot. Summ. J. Ex. W. But in order to show that she is similarly situation to this male employee, Mitchell must demonstrate "that all of the relevant aspects of her employment situation were 'nearly identical' to" his. Neuren v. Adduci,

Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995). Mitchell fails to create a material dispute on this point. Mitchell's termination was based on more than the times she was classified as AWOL—it was also based on several instances of tardiness, post-abandonment, and past discipline. And without a fuller picture of this male employee's discipline record, one could only speculate that she was treated unfairly as compared to him. With just this evidence, a reasonable jury could not find that the District terminated Mitchell because of her gender. The Court will therefore grant summary judgment on Mitchell's Title VII termination claim.

## IV. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment. A separate Order will accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: March 30, 2018